UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| HANNAH CLARK, *et al.*, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | )   Civil No: 3:21-cv-00026-GFVT-EBA |
| | ) |
| FRANKLIN COUNTY, KENTUCKY, *et al.*, | ) |
| | )   **MEMORANDUM OPINION** |
| | )   **&** |
|    Defendants/Third-Party Plaintiffs, | )   **ORDER** |
| v. | ) |
| | ) |
| DELANO WASHINGTON, | ) |
| | ) |
|    Third-Party Defendant. | ) |

*** *** *** ***

A Nissan Altima led police on a high-speed chase through the streets of Frankfort, Kentucky.  When the fleeing motorist finally stopped, a pursuing officer forcibly removed the backseat passengers from the vehicle.  Unbeknownst to the officer, the passengers were unarmed women involved in the chase involuntarily.  Because he acted reasonably with the information he had at the time, the officer's Motion for Summary Judgment **[R. 61]** is **GRANTED** and the Plaintiffs' Motion for Partial Summary Judgment **[R. 65]** is **DENIED**.

**I**

In the early morning hours of September 20, 2020, Franklin County Sheriff's Office Sargeant Doty and Deputy Wills were working the "third shift" in Frankfort, Kentucky.  [R. 61-1 at 2; R. 23 at 3.]  Doty spotted a "Nissan Altima driving erratically[.]"  [R. 61-1 at 3; R. 61-5 at 2.]  Suspecting an impaired driver, he initiated a traffic stop.  [R. 61-3 at 27–28; R. 61-5.]  But the motorist did not stop.  Instead, the Altima proceeded to lead police on a dangerous, high-speed chase through the streets of Frankfort.  [R. 61-5; R. 64.]

The evasive driver, Doty would later learn, was Delano Washington. [R. 67-5.] Marvelous Davis rode in Washington's front passenger seat. [R. 61-9.] Plaintiff Harris occupied the right side of the backseat, directly behind the front passenger seat. *Id.* Plaintiff Clark was seated directly behind the driver's seat, on the left side of the vehicle. *Id.* Clark reports that she was afraid for her life and asked Washington several times to stop the car. *Id.*

Washington continued to evade law enforcement at speeds of up to 90 miles per hour. [R. 65-1 at 48; R. 67-5.] As it became clear he had no intention of stopping, additional officers joined in pursuit. [R. 65-1 at 48; R. 67-5.] One of these officers was Franklin County Sheriff's Deputy Ray. [R. 61-6; R. 65-1.] The remainder of the chase and its aftermath (including the purportedly excessively forceful incident) are caught on a dash camera video, which the Court has carefully reviewed. [R. 64.] On the recording, Doty's cruiser can be seen pursuing Washington's vehicle for approximately ten additional minutes.[1] *Id.* Washington continued to drive erratically in residential areas, creating an objectively dangerous situation for pursing officers and other motorists. *Id.*; [R. 65-1 at 48; R. 67-5.] Finally, Washington made an abrupt turn into the parking lot of an apartment complex. [R. 64.] The sudden maneuver caused him to collide with Doty's cruiser. *Id.* Undeterred, Washington continued to accelerate through the parking lot before braking abruptly. *Id.* Doty's cruiser, which had been following quite closely, read-ended the Altima. *Id.* As both vehicles finally halted in front of the apartment complex, the front driver's side of Doty's cruiser was pressed up against the back passenger side of the Altima. *Id.*

---

[1] Doty testified that he observed "drugs or substances or something being thrown out of the passenger compartment" during the pursuit. [R. 61-3.] The Court cannot discern that on the video provided, and will therefore disregard the allegation when reviewing the Defendants' Motion for Summary Judgment.

2

Officers approached the vehicle swiftly with guns drawn. *Id.* On the dash cam video, they can be heard yelling at the vehicle's occupants to "get on the f***ing ground." *Id.* Washington promptly exited the vehicle, laid face down on the ground, and was placed under arrest. *Id.* But Plaintiffs Clark and Harris failed to exit the Altima. *Id.* While Ms. Harris displayed her hands by placing them out the window, Clark's hands were not visible. *Id.*

At that point, "Deputy Ray determined it was appropriate to physically extract the passengers from the vehicle." [R. 61-1 at 4.] Ray reached into the driver's side of the Altima's backseat with his left hand, grabbed Hannah Clark by the forearm, and pulled her out of the vehicle and onto the sidewalk. [R. 64.] With his right hand, he kept his handgun pointed at Clark. *Id.* After handcuffing Clark, Deputy Ray reached into the backseat again, pulled Maysia Harris across the backseat by her arm, and threw her onto the ground. *Id.*

On June 21, 2021, Clark and Harris filed a federal excessive force Complaint against Deputy Ray, his supervisors (Sargeant Doty and Sheriff Quire), and Franklin County.[2] [R. 1.] On March 29, 2022, this Court partially granted and partially denied the Defendants' Motion to Dismiss the Complaint. [R. 12.] In particular, the Court dismissed the Plaintiffs' negligence and gross negligence claims against Defendant Ray, as well as their claims for abuse of public office. *Id.* The Court permitted the remaining claims to proceed and declined to apply qualified immunity at the 12(b)(6) stage. *Id.* Clark and Harris subsequently filed an Amended Complaint. [R. 23.]

---

[2] Defendants have also filed a third-party Complaint against Delano Washington, the driver of the Altima. After Mr. Washington failed to respond, the Clerk entered default. The Court granted a motion for default judgment; however, it deferred any determination of damages pending resolution of the Third-Party Plaintiffs' liability.

3

A veritable grab-bag of claims remain. Clark and Harris assert Fourth and Fourteenth Amendment excessive force claims against Sheriff Quire, Deputy Ray, Sargeant Doty (in their individual capacities), and Franklin County. [R. 23.] They request direct liability for Deputy Ray, supervisory liability for Doty and Quire, and municipal liability for Franklin County. *Id.* Further, the Plaintiffs bring a 42 U.S.C. § 1983 conspiracy claim against Franklin County and Defendant Quire for conducting a "sham" investigation of the alleged misconduct. *Id.* Finally, they assert a variety of state claims.[3] *Id.* Franklin County, Sheriff Quire, Sargeant Doty, and Deputy Ray now move for summary judgment as to all of these claims. [R. 61-1.] Clark and Harris oppose this request, instead seeking partial summary judgment as to the Fourth Amendment excessive force and battery claims against Defendant Ray. [R. 65.]

**II**

Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

---

[3] The Plaintiffs' Amended Complaint also references claims the court has already dismissed. The Court will disregard these allegations, as well as claims of excessive force against Washington (the vehicle's driver), since Mr. Washington is not a plaintiff in this action.

4

functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255).

"[T]he standards upon which the court evaluates [] motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (internal citation omitted). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

Further, when a purported incident of excessive force is captured on film, a court in the summary judgment posture should rely on the undisputed footage to determine whether the force was reasonable as a matter of law. *See Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020) ("In describing what happened, we rely mainly on undisputed video footage from police dashboard cameras on the scene. We adopt the plaintiff's version of any facts not caught on film."); *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) ("At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [the defendant's] actions . . . is a pure question of law."); *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) ("Dunn argues that a jury must watch the video and decide whether the Officers used excessive force. This argument, however, is directly contradicted by *Scott*, which instructs us to determine as a matter of law whether the events depicted on the video, taken in the light most favorable to Dunn, show that the Officers' conduct was objectively reasonable.").

### A

Though the Plaintiffs present a myriad of issues, their Fourth Amendment excessive force claim against Deputy Ray is effectively dispositive of their remaining allegations. Ray urges summary judgment on the grounds that (1) his use of force was objectively reasonable, and; (2) even if it wasn't, he is entitled to qualified immunity. [R. 61-1.]

### 1

Federal qualified immunity can shield officials sued in their individual capacities from liability for Constitutional claims. Consistent with its provisional nature, the immunity protects "government officials performing discretionary functions" from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Ascertaining whether a government official is entitled to qualified immunity is a two-step inquiry. A court must "determine whether the plaintiff has alleged facts which, when taken in the light most favorable to [him], show that the defendant-official's conduct violated a constitutionally protected right[.]" *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 727 (6th Cir. 2011) (internal citation omitted). Next, the court should assess "whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Id.* "The order in which [the court] address[es] the two prongs of the qualified immunity analysis is left to [its] discretion." *Id.*

### a

"[T]he Fourth Amendment [] protects individuals from the use of excessive force during an arrest or investigatory stop." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (citing

*Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).  Courts assessing whether a particular incident of force was excessive apply an "objective reasonableness" analysis.  *Id.*  Objective reasonableness requires an assessment of the "reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not [] the underlying intent or motivation of the defendants." *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).  Three factors guide this analysis: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396)); *see also Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022) ("This list is not exhaustive.").  Ultimately, courts should consider "'reasonableness at the moment' force is used, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Martin*, 712 F.3d at 958 (quoting *Graham*, 490 U.S. at 396).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment[.]'"  *Coley v. Lucas Cnty.*, 799 F.3d 530, 539 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

b

Several times, the Sixth Circuit has considered whether an officer's forcible removal of an individual from a vehicle following a high-speed chase constituted excessive force. Defendant Ray urges that one of these cases, *Dunn v. Matatall*, is dispositive.  549 F.3d 348 (6th Cir. 2008).  In *Dunn*, a driver evaded police for two minutes before ultimately coming to a stop. *Id.* at 350.  Though the motorist attempted compliance with orders, his good faith efforts to exit the vehicle were impeded by his seat belt.  *Id.* at 351.  The still-buckled belt caused a struggle to ensue as an officer attempted to extricate Dunn from the vehicle.  *Id.*  Perceiving the struggle and

7

inferring recalcitrance, a second officer approached and assisted in pulling Dunn out of the car and onto the street. *Id.* at 351–52. "[G]iven the heightened suspicion and danger brought about by the car chase and the fact that an officer could not know what other dangers may have been in the car," the Sixth Circuit reasoned, "forcibly removing Dunn from the car to contain those potential threats was objectively reasonable." *Id.* at 355.

On at least two other occasions, the Sixth Circuit held that the forcible extraction of a motorist following a high-speed chase was reasonable. *See Blosser v. Gilbert*, 422 F. App'x 453, 457–59 (6th Cir. 2011); *Williams v. Ingham*, 373 F. App'x 542, 547–48 (6th Cir. 2010); *see also Est. of Brackens v. Louisville Jefferson Cnty. Metro Gov't*, 680 F. App'x 362, 366–67 (6th Cir. 2017) ("[W]e have [] found that in light of the potential safety threat to officers in such cases, the force required to remove from a vehicle a motorist who does not comply with police commands following a chase is not excessive under the Fourth Amendment.").

Though *Dunn* is undoubtedly instructive, Deputy Ray's singular reliance on it is misplaced. The Sixth Circuit has drawn a distinction between the post-chase removal of a driver and of an innocent passenger; and the passenger line of cases is more directly relevant here. *See Browning v. Edmonson Cnty.*, 18 F.4th 516, 528 (6th Cir. 2021) (distinguishing "us[e] [of] force on [a] driver, who ha[s] *already* engaged in highly dangerous evasive driving" from use of force on "a passenger in the backseat whose worst apparent criminal activity was not wearing a seatbelt") (emphasis in original); *Carter v. Klenner*, No. 20-10442, 2022 WL 4587137, at *6 (E.D. Mich. Sept. 29, 2022), *appeal dismissed*, No. 22-1989, 2023 WL 3166362 (6th Cir. Mar. 14, 2023) ("[T]he [Sixth Circuit] reached the common-sense conclusion that greater use of force is justified following a chase where a 'driver [ ] had already engaged in highly dangerous evasive driving' but not in the case before it where the plaintiff 'was a passenger in the backseat whose

8

worst apparent criminal activity was not wearing a seatbelt.'" (quoting *Browning*, 18 F.4th at 528)).

*Estate of Brackens v. Louisville Jefferson County Metro Government* is particularly informative. 680 F. App'x 362 (6th Cir. 2017). There, a terrified, physically disabled passenger called 911 to report that he was being held against his will in a vehicle evading police. *Id.* at 364. Unfortunately, dispatch misunderstood his statements, and inexplicably informed pursuing officers that Brackens was a suicidal, homicidal threat with an outstanding felony warrant. *Id.* at 364–65. Operating under that impression, officers forcibly dragged him out of the vehicle when he failed to comply with an order to exit. *Id.* at 365. At the same time, another officer kept his firearm trained on Brackens. *Id.* at 365. Though Brackens turned out to be an innocent victim, the Sixth Circuit found that the context of the car chase "reasonably br[ought] about 'heightened suspicion and danger[.]'" (quoting *Dunn*, 549 F.3d at 355). The Panel emphasized Brackens's noncompliance, along with officers' understandable (albeit inaccurate) belief that he posed a safety threat. *Id.* at 367. Considering the dangerous situation and the knowledge possessed by officers at the time, the force used against Brackens was constitutionally reasonable. *See id.* ("Given the information at the LMPD officers' disposal, the few seconds that elapsed between the order and Brackens's removal gave them little opportunity to appreciate fully that Brackens was disabled and unarmed, let alone that he had no felony warrants and was caught up in the chase involuntarily.").

*Tallman v. Elizabethtown Police Department* yielded a similar result. 167 F. App'x 459 (6th Cir. 2006). There, a motorist came to a stop after his high-speed evasion of police was thwarted by "stingers" in the roadway. *Id.* at 460–61. His front-seat passenger remained motionless in the vehicle, failed to comply with orders, and did not display his hands. *Id.* at 461.

9

In an apparent effort to extract the passenger from the vehicle, an officer "reached through the passenger side window with one arm while still holding his gun pointed at [the passenger] with the other arm." *Id.* As he did so, he inadvertently discharged his weapon, killing the passenger. *Id.* Given the context, the Sixth Circuit reasoned, the officer was justified in reaching into the vehicle with a weapon aimed at the passenger's head. *Id.* at 466–67. The passenger was not complying with orders, the officer couldn't tell whether he was armed, and the chase reasonably led the officer to conclude that the passenger posed a threat. *Id.* Though the unintended outcome of the incident was tragic, the force used by the officer was reasonable. *Id.*

Still, the Sixth Circuit has made clear that a high-speed chase is not a per se justification for gratuitous force against innocent passengers. *Browning*, 18 F.4th at 526–27. In *Browning*, a fleeing motorist came to a stop after his vehicle collided with that of a third party. *Id.* at 522. When an unconscious child in the backseat failed to comply with orders, an officer tased the child. *Id.* at 522, 524. Unpersuaded by the officer's request for immunity, the Sixth Circuit determined that the severity of the driver's crimes could not be fairly imputed to the unresponsive minor. *Id.* at 526 (citing *Graham*, 490 U.S. at 396). Further, the Panel emphasized, the child posed a minimal threat and was not actively resisting. *Id.* at 526–27; *see id.* at 529 ("[A] reasonable jury could find that use of a taser was not objectively reasonable and therefore amounted to excessive force under the law.").

c

Without addressing these teachings from the Sixth Circuit, Clark and Harris charge Ray with violating clearly established law. But the passenger line of cases suggests otherwise. Like the passengers in *Tallman* and *Brackens*, the Plaintiffs rode in a vehicle that evaded police through highly dangerous driving. Though Tallman, Brackens, Clark, and Harris may have

10

posed a minimal threat, pursuing officers had every reason to suspect that they were dangerous. Further, like Tallman and Brackens, Clark and Harris failed to comply with orders to exit the vehicle. Finally, the reasonable force used on Tallman and Brackens is analogous to the force used here; in all three instances, officers extracted (or attempted to extract) the passenger from the vehicle while pointing a weapon at the passenger. Further, the facts of *Browning* are readily distinguishable. *Browning* involved the use of a taser; whereas, here, Ray merely pulled the passengers from the vehicle. And unlike the child in *Browning*, Clark and Harris were conscious adults who failed to follow orders.

### i

The *Graham* analysis is consistent with this conclusion. *See Graham*, 490 U.S. at 396. First, the severity of the crime counsels in favor of reasonableness. Deputy Ray appropriately emphasizes the seriousness of Mr. Washington's high-speed flight from law enforcement. *See Tallman*, 167 F. App'x at 466 ("Because the crime involved fleeing from law enforcement, the severity of the crime was great."). Further, he appears to take the position that the severity of Washington's crime should be imputed to Clark and Harris for the purposes of the first *Graham* factor. Clark and Harris fail to substantively address this factor, except to point out that they were not driving the vehicle. Neither argument is quite right.

First, Deputy Ray's attempt to hold Clark and Harris responsible for Washington's crimes contravenes the Sixth Circuit's directive in *Browning*. *See Browning*, 18 F.4th at 526 ("Nor does the fact that there was a police pursuit independently warrant the use of force, despite the seriousness of the offense, because [plaintiff] was a passenger sitting in the backseat and is not responsible for the driver's crimes."). Taking the facts in the light most favorable to Clark and Harris, they were not willing participants in the chase. In fact, Clark states that she pleaded

11

several times with Washington to stop the vehicle. [R. 61-9.]  And Deputy Ray concedes that he did not observe Clark or Harris committing any "arrestable offense" during the pursuit. [R. 65-1 at 57.]  Moreover, "the severity of [Washington's] crime in initiating the pursuit cannot be imputed onto [Clark and Harris] for the purposes of the first *Graham* factor." *Browning*, 18 F.4th at 526.

Nevertheless, Ray is correct that the severity of Washington's crime justifiably generated heightened suspicion and concern.  *See Est. of Brackens v. Louisville Jefferson Cnty. Metro Gov't*, 680 F. App'x 362, 367 (6th Cir. 2017) ("[A] car chase reasonably bring[s] about 'heightened suspicion and danger[.]'" (quoting *Dunn v. Matatall*, 549 F.3d 348, 355 (6th Cir. 2008))).  Though the Plaintiffs are not responsible for Washington's crimes, their presence in the offending vehicle cannot be reasonably ignored.  *See id.* (considering the fact that Brackens was a passenger in a vehicle responsible for initiating a 20-minute, high speed chase).  Accordingly, without imputing Washington's crimes to Clark and Harris, the Court finds that the first *Graham* factor weighs in Deputy Ray's favor.

## ii

The second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others," also cuts in favor of reasonableness.  As Ray approached the Altima, he had no way of knowing that its backseat passengers were being effectively held hostage to the criminal whims of their driver.  *See Est. of Brackens*, 680 F. App'x at 367 ("Given the information at the LMPD officers' disposal, the few seconds that elapsed between the order and [passenger's] removal gave them little opportunity to appreciate fully that [passenger] was disabled and unarmed, let alone that he had no felony warrants and was caught up in the chase involuntarily."); *Hurd v. Adams*, No. 7:20-CV-00047-EBA, 2023 WL 4306667, at *12 (E.D. Ky.

12

June 30, 2023) ("Adams had every reason to believe that the vehicle's occupants posed a danger, and no reason to believe the passenger, Hurd, was essentially held hostage to the high-speed police chase."). To the contrary, "[i]t was reasonable for [Ray] to consider [plaintiffs] a safety threat. [They] w[ere] sitting in . . . a vehicle that had only just stopped after a[n] [at least ten minute] chase. Unlike [Washington], who immediately exited the vehicle and dropped to the ground when ordered to do so, [Clark and Harris] did not respond." *See Est. of Brackens*, 680 F. App'x at 367.

Ray's deposition testimony supports this conclusion:

> when I approached the vehicle and ordered the—the occupants out of the vehicle, the backseat—seat passengers refused to [exit] the vehicle. And at that point in time, I did not know why they were not getting out of the vehicle on our commands. So at that point in time, it was high risk and I felt that my life and also the lives of the community and the officers on the scene were in danger.

[R. 61-4 at 25.] True, Clark and Harris didn't pose much of a threat. But courts should consider "'reasonableness at the moment' force is used, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013). Because Ray had every reason to consider the Plaintiffs a threat, the second *Graham* factor weighs in his favor.

### iii

As does the third. Though Clark and Harris were not "actively resisting arrest or attempting to evade arrest by flight," they were not complying with officers' orders. Clark and Harris correctly note that the Sixth Circuit "ha[s] drawn a distinction between passive and active resistance, and failing to exit a vehicle is not active resistance[.]" *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (quoting *Coles v. Eagle*, 704 F.3d 624, 629–30 (9th Cir. 2012)); *see also id.* ("If there is a common thread to be found in [Sixth Circuit] caselaw on this

13

issue, it is that noncompliance alone does not indicate active resistance; there must be something more."). Still, as the dash cam footage reveals, "neither [were they] complying with [Ray's] verbal orders." *Tallman*, 167 F. App'x at 466. The Plaintiffs failed to follow the order to get on the ground, and Ray could not see Clark's hands. Their non-compliance, passive though it may have been, weighs modestly in Deputy Ray's favor. *See id.* (passenger's failure to comply with order to exit vehicle was properly considered even when he was not actively resisting); *Dunn*, 549 F.3d at 354–55 (considering motorist's failure to comply with directive to exit vehicle even when his noncompliance was caused by his becoming stuck in his seatbelt); *Est. of Brackens*, 680 F. App'x at 367 (noting passenger's failure to exit vehicle immediately even though his ability to do so was impeded by his physical disabilities).

The Plaintiffs suggest that exiting the vehicle was impossible, since Harris's door was obstructed by Doty's cruiser. Even accepting that Harris's door was inoperable, the dash cam video reveals that Ms. Clark's door remained unobstructed. Yet, the Plaintiffs made no attempt to exit through that door. Moreover, the fact that Harris placed her hands out the window while repeatedly failing to comply with orders did not create an unambiguous signal of surrender. *See Ashford v. Raby*, No. 18-10813, 2019 WL 2231188, at *3 (E.D. Mich. May 23, 2019), *aff'd*, 951 F.3d 798 (6th Cir. 2020) ("[A]lthough Plaintiff claims that he had 'surrendered,' the video makes clear that he made no attempt to exit the vehicle despite multiple orders to do so. The fact that Plaintiff held his hands in the air, while resisting all other instructions from the officers, would not necessarily lead a reasonable officer to believe that Plaintiff had surrendered and posed no further threat."). For all these reasons, the balance of the *Graham* factors counsels in favor of a finding of reasonableness.

2

The Plaintiffs resist this conclusion, relying heavily and exclusively on *Brown v. Lewis* for the proposition that Ray's force was excessive as a matter of law. 779 F.3d 401 (6th Cir. 2015). In *Brown*, officers "grabbed [a complaint detainee] by her hooded sweatshirt and threw her to the ground about ten feet away." *Id.* at 408. "She fell onto her hands and knees, at which point one or two officers put their knees on her back, pushing her to the ground." *Id.* Unconvinced by the officers' request for immunity, the Sixth Circuit emphasized Ms. Brown's full compliance with officers' orders. *Id.* at 418. The officers did not observe any weapons, Brown kept her hands visible throughout the entire encounter, and the officers "were not certain that any crime had occurred" to begin with. *Id.* The Panel distinguished the facts of *Brown* from the facts of *Dunn v. Matatall*, noting that "similar actions during handcuffing were held not to be unreasonable [in *Dunn*] because the suspect had engaged in a high-speed chase with police and failed to unbuckle his seatbelt when ordered to leave the car." *Id.* (citing *Dunn*, 549 F.3d at 354).

Though neither is a perfect analogue, the facts of this case are closer to *Dunn* than *Brown*. First and most importantly, *Brown* did not involve a high-speed chase. Unlike Clark and Harris, Ms. Brown was not connected to any crime, and was detained only because of an error on the part of officers. Further, the force used against Brown exceeded the force used by Deputy Ray. Brown was thrown ten feet, whereas Clark and Harris were pulled out of a vehicle and onto the ground. Finally, unlike Brown, Clark and Harris failed to comply with orders. Given these conspicuous dissimilarities, the Plaintiffs' reliance on *Brown* is misplaced. Further, because no constitutional violation occurred, the Court need not assess whether the right at issue was clearly established.

But even assuming *arguendo* that Ray did violate the Fourth Amendment, "the right in question was not clearly established so as to preclude the application of qualified immunity." *Tallman*, 167 F. App'x at 467. Clark and Harris repeatedly emphasize *Brown*'s holding that "pulling a compliant detainee out of her car and throwing her to the ground in the process of handcuffing her is clearly established excessive force." *Brown*, 779 F.3d at 419. But as the Court has already explained, Clark and Harris were not compliant. And the Plaintiffs do not cite any other clearly established right that could have been violated in this case. Accordingly, Deputy Ray is entitled to summary judgment as to the Plaintiffs' Fourth Amendment excessive force claim.

Finally, because the Fourth Amendment governs "the force used by an officer during the course of an arrest," *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1003 (6th Cir. 2024), "a due process analysis under the 14th Amendment is inappropriate." *Curtis v. Lauderdale Cnty.*, No. 2:23-CV-02528-TLP-ATC, 2025 WL 367405, at *6 (W.D. Tenn. Jan. 27, 2025). Thus, Deputy Ray is similarly entitled to summary judgment as to the Plaintiffs' Fourteenth Amendment excessive force claim.

### B

To the extent that Plaintiffs additionally assert a Fourth Amendment or other constitutional violation based on the decision to continue the chase, the number of cruisers involved in the chase, or an alleged "PIT maneuver," they cite no supportive authority. This is perhaps unsurprising, given that relevant precedent cuts against them. *See Scott v. Harris*, 550 U.S. 372, 385 (2007) ("[W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create[.]"); *see also id.* at 386 ("A

police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."); *Tallman*, 167 F. App'x at 464 ("[T]his court has held that engaging in a high-speed pursuit in the course of a traffic stop is objectively reasonable as a matter of law." (citing *Galas v. McKee*, 801 F.2d 200, 203 (6th Cir. 1986)); *see also Smith v. Lexington Fayette Urb. Cnty. Gov't*, 884 F. Supp. 1086, 1094 (E.D. Ky. 1995) (high speed pursuit of intoxicated driver did not violate the Constitution, even when police neglected to employ emergency equipment, chased the suspect through populated areas, disregarded traffic signals, and violated internal policies); *Black v. City of Blue Ash*, No. 1:08-CV-00584, 2010 WL 1027414, at *6 (S.D. Ohio Mar. 17, 2010) (dangerous, high-speed chase was reasonably halted with a PIT maneuver).[4]

Even accepting the Plaintiffs' assertion that pursuing officers ran afoul of internal policies, [R. 67 at 2–3], that fact does not save their otherwise unsuccessful constitutional case. *See Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017) ("[T]he fact that an officer's conduct merely violates a departmental policy does not cause that officer to lose their qualified immunity.") (internal citation omitted); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) ("[T]he Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim."). Because the Court can discern no

---

[4] A PIT maneuver, or "precision immobilization technique," is "'a method of causing a [vehicle] to stop by ramming it not squarely from behind but instead at an angle, causing it to spin and stop.'" *Coitrone v. Murray*, No. 1:13-CV-00132-GNS, 2015 WL 2384298, at *2 n.3 (W.D. Ky. May 19, 2015) (quoting *Wourms v. Fields*, 742 F.3d 756, 758 (7th Cir. 2014)). Clark and Harris charge Doty with violating policy by employing a PIT maneuver to stop the Altima. Doty disputes that a PIT maneuver was used, and the video evidence supports his version of events. [R. 61-3 at 25–26.] Because Washington's vehicle was already braking aggressively when Doty rear-ended him, and because the collision did not cause the Altima to spin, the Court is doubtful that a PIT maneuver took place. But even if Doty's contact with Washington's vehicle could be fairly characterized as a PIT maneuver, that maneuver did not violate the constitution. *See, e.g.*, *Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

17

constitutional violation, it will dismiss any additional constitutional claims stemming from the chase, itself. Now, the federal claims against Deputy Ray are gone. Still remaining are the state tort claims, as well as the federal municipal liability, supervisory liability, and conspiracy claims against Defendants Doty, Quire, and Franklin County. Those remaining federal claims similarly fail.

### C

As for the supervisory and municipal liability claims, it's easy to see why. Since there's no underlying constitutional violation, those forms of secondary liability are a nonstarter. *See S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trs.*, 771 F.3d 956, 963 (6th Cir. 2014) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor.") (internal citation omitted); *Est. of Brackens*, 680 F. App'x at 367–68 ("[N]o LMPD officer can be held liable for failure to supervise or intervene because the underlying conduct was not unconstitutional."); *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) ("[B]ecause Wiley failed to demonstrate a constitutional violation by any of the City Defendants, the district court correctly determined that her claim for municipal liability must also fail."). Accordingly, the Defendants are entitled to summary judgment as to the supervisory and municipal liability claims.

### D

The civil conspiracy claims fail for similar reasons. Clark and Harris state that "Defendants, by virtue of their sham investigation of Ray's misconduct, conspired to deny Plaintiffs due process in violation of the Fourteenth Amendment." [R. 23.] A § 1983 civil conspiracy is "'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal citation

18

omitted). A civil conspiracy plaintiff "must show that (1) a 'single plan' existed, (2) [a defendant] 'shared in the general conspiratorial objective' to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused injury' to [the plaintiff]." *Id.* Stated another way, a § 1983 conspiracy requires an underlying constitutional violation. *See Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (6th Cir. 2007) ("[T]o bring a conspiracy claim as against the Township and McKenna, Bauss must first establish that he has suffered a constitutional deprivation."); *see also Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985).

The Court has already determined that no constitutional violation occurred. And the Plaintiffs' briefing provides no additional explanation as to how their due process rights were violated. Accordingly, the Plaintiffs' civil conspiracy claims similarly fail. *See Wiley*, 330 F. App'x at 530 ("[Plaintiff] cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her.").

### E

Now, all of the Plaintiffs' federal claims are gone. The only remaining claims are the various state claims. But "'a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.'" *Est. of Brackens*, 680 F. App'x at 368 (internal citation omitted). Accordingly, the Court will dismiss the Plaintiffs' state claims without prejudice. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) ("This rule accords with principles of federalism: 'Needless decisions of state law should be avoided both as

a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'") (quoting *Gibbs*, 383 U.S. at 726).

### III

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Because Deputy Ray acted reasonably in a rapidly evolving situation, it is hereby **ORDERED** as follows:

1. The Defendants' Motion for Summary Judgment **[R. 61]** is **GRANTED**;

2. The Plaintiffs' Motion for Partial Summary Judgment **[R. 65]** is **DENIED**;

3. The Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE**;

4. The Plaintiffs' state claims are **DISMISSED WITHOUT PREJUDICE**;

5. This action is **DISMISSED** and **STRICKEN** from the Court's active docket; and

6. A Judgment will be entered contemporaneously herewith.

This the 26th day of March, 2025.

Gregory F. Van Tatenhove
United States District Judge